BROWN, Judge.
In separate indictments Virgil Gross and his wife, Ronnie Gross, were charged respectively with first and second degree murder of Loyce Sheftall-Harrison. A third person, Mario Jones, was also independently indicted with first degree murder. Both husband and wife moved to suppress their joint confession and its derivative evidence. Ronnie Gross also moved to suppress another statement given the following week. The trial court heard both motions at the same time and found the confessions and evidence admissible. Both sought a review of this ruling through our supervisory jurisdiction. Because their motions presented identical issues and involve the same evidence, their writ applications to this court were consolidated. Initially, we declined to exercise our supervisory jurisdiction because the applicants, if convicted, had an adequate remedy on appeal; however, a writ application to the Supreme Court was granted with the case being remanded to this court for briefing, argument and a full opinion. The pivotal issue argued is the voluntariness of the statements.
Being assisted by counsel, both husband and wife entered into a plea agreement with the District Attorney. The agreement resulted in a joint statement that led to the location of the victim’s body and murder *132 weapon. Further investigation, however, revealed that the statement was not completely true and that both husband and wife were more involved in the murder than related in their confession.
The plea agreement provided that if applicants were not totally truthful they could be prosecuted fully. Invoking that provision, the District Attorney obtained indictments for first and second degree murder. If applicants had been truthful, the agreement provided immunity to the wife and a plea for the husband to accessory after the fact; however, neither applicant claimed entitlement to enforcement of that provision. Applicants assert only that the confessions and the discovered evidence were the result of an inducement or promise and thus were involuntary. The trial judge denied the motions to suppress. For the following reasons, we affirm.
FACTS
The victim, Loyce Sheftall-Harrison, disappeared from her home in West Monroe on or about July 27, 1989. Shortly, thereafter, the West Monroe Police Department was notified of the disappearance and entered a missing person report into the National Crime Information Computer (NCIC).
On August 29, 1989, Chief Charles Johnson of the Mississippi Valley College campus police in Itta Beta, Mississippi, approached a group of students standing by a Lincoln Continental parked on campus. Mario Jones told Chief Johnson that he was the owner of the vehicle. After Jones had left in the vehicle, Chief Johnson received a response to his license check and found that the automobile was registered to Loyce Sheftall-Harrison who was reported missing in Louisiana. Chief Johnson, who was also a deputy sheriff, relocated the vehicle, which was being driven by Jones, at a store just off-campus. Johnson informed Jones of the problem. Another deputy arrived at the store and was told by Jones that he was given the car by Mrs. Harrison who was his “auntie.” Jones was taken to the LeFlore County Sheriffs Office where he again claimed the vehicle had been given or sold to him by Mrs. Harrison.
The West Monroe Police were notified and detectives McDanell and Powdrill traveled to Mississippi on August 30, 1989. There, the officers questioned Jones. After questioning, Jones voluntarily consented to return with the officers to West Monroe. Jones continued to assert that Mrs. Harrison had sold him the Lincoln.
Virgil and Ronnie Gross lived in the victim’s apartment complex with Virgil acting as a handyman. In the middle of August, Virgil had been questioned by the police and stated that he had no knowledge of Mrs. Harrison’s disappearance. On August 30, 1989, the police obtained information that a man fitting Virgil’s description had gone to the morgue and inquired about the time frame for the decomposition of a body. After returning from Mississippi on August 30, detectives McDanell and Powd-rill took two recorded statements from Virgil who continued to deny knowledge of what had happened to Mrs. Harrison. Virgil stated that he knew Mario Jones and that Jones had attempted to rent an apartment but was refused by Mrs. Harrison because she did not lease to blacks. Virgil also stated that Jones threatened to kill Mrs. Harrison. After being identified by a witness, Virgil admitted that he had gone to the morgue and asked about the decomposition of bodies because he was concerned for Mrs. Harrison. Virgil denied seeing Jones with the Lincoln on the day of Mrs. Harrison’s disappearance which contradicted Jones’ statement to the detectives. Virgil did not move to suppress these statements of August 30 and their admissibility is not in question.
On August 31, 1989, Virgil Gross and his wife, Ronnie, met with officers at the West Monroe Police Department; however, before talking they requested and were allowed to telephone their attorney. While waiting on defense counsel’s arrival, Detective Powdrill contacted the Ouachita Parish District Attorney who came to the police station. After consulting with Virgil and Ronnie, their attorney told the District Attorney what he could expect the Grosses to say and then arranged a plea bargain. Defense counsel represented to the district *133 attorney that Ronnie Gross had not been involved in the homicide, that Virgil Gross participated only after the fact and that he could lead the police to the victim’s body.
The district attorney agreed that if the Grosses cooperated and were truthful, he would grant Ronnie Gross transactional immunity from prosecution and would allow Virgil Gross to plead guilty to being an Accessory After The Fact to Second Degree Murder.
A specific provision of the plea agreement stated that if applicants were untruthful “at any time concerning matters directly or indirectly connected to [the] Loyce Sheftall-Harrison investigation” there would be no immunity and no plea to accessory after the fact. The Grosses acknowledged that if they did not fulfill the terms of the agreement their statements could be used as evidence in any subsequent prosecution.
Following a thorough discussion of the terms of the agreement, the Grosses gave a joint statement naming Mario Jones as Mrs. Harrison’s killer. In an effort to explain how the victim’s blood was in their apartment, the Grosses claimed Jones forced Virgil by threats to help dispose of the body. The Grosses then led police to a remote area where the skeletal remains of the victim were found. The Grosses later helped the police recover a steel pipe that was allegedly used as the murder weapon.
Independently, the police discovered evidence that the August 31, 1989, joint statement was not completely true and that both Virgil and Ronnie Gross had played a much larger role in the murder. Specifically, it was discovered that Ronnie Gross possessed a considerable amount of jewelry belonging to Mrs. Harrison including what she had been wearing on the day she disappeared; a witness had seen Virgil loading the victim’s body into the trunk of a car while Ronnie watched; and Ronnie had told a friend that she was burning a map because it was incriminating.
On September 6, 1989, the district attorney contacted defense counsel and explained the new information which demonstrated that Virgil and Ronnie Gross had not been truthful and were more involved than their statement indicated. Ronnie Gross was arrested on the night of September 6, 1989. After her arrest the jail documented several requests by Ronnie Gross to speak with West Monroe police officers. Even after meeting with her attorney, she continued her efforts to contact an investigator. On September 7 Detective Powdrill responded to a written request from Ronnie Gross and took a recorded statement. Her motion to suppress covered both the statement of September 7th and that given on August 31st.
DISCUSSION
The only issue involved with the August 31st joint statement and its derivative evidence is whether a confession is per se inadmissible in a criminal trial because it was made as the result of a plea agreement. It is clear that a confession is not voluntary if obtained by any promise, however slight. Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Applicants claim that the “deal” was the inducement causing the statement.
The existence of a plea bargain, which may have factored into a defendant’s decision to give a statement, does not necessarily make the statement involuntary. The bargain does represent an important element in the analysis; however, to determine if the statement was freely given, we must review the totality of the circumstances. State v. Lewis, 539 So.2d 1199 (La.1989).
In State v. Nall, 379 So.2d 731 (La.1980), after defendant’s attorney represented the “true facts” to the district attorney, a plea agreement was perfected. Defendant was to confess and testify against the man he identified as the perpetrator in return for a reduced charge and ten year sentence. After the agreement was signed, Nall changed his story to reveal that he actually hired and paid the other man to kill the victim. Nall, 379 So.2d at 732-733.
In Nall, the Louisiana Supreme Court determined that the plea bargain was invalid because of error and lack of cause. The *134 court then found that Nall had given his statement in the belief that the district attorney would honor the agreement to accept a guilty plea to manslaughter. Under these circumstances, the court held that defendant’s statement was not voluntary and neither the statement nor its fruits could be used in any subsequent prosecution. Nall, 379 So.2d at 734.
However, Chief Justice Summers, dissenting in part, poignantly stated:
I have serious misgivings concerning that portion of the majority opinion which declares that the statement ... was involuntary. Moreover, in the absence of some inducement on the part of the State to bring about this ... statement I see no sound reason ... to suppress the information obtained as a result of that statement.
Here, the violation of the defendant’s plea bargain enables him to virtually insulate himself from prosecution. For when he disclosed the true facts of the offense, the majority holds those facts cannot be used against him.
A more realistic inference to be drawn from the facts of this case is that these events were deliberate and designed, not involuntary, on the part of the defendant. (Emphasis added).
In State v. Lewis, supra, the Louisiana Supreme Court once again considered the impact of statements elicited by the state during plea negotiations. Following negotiations with the FBI and the Rapides Parish District Attorney’s office, defendant agreed to plead guilty to a misdemeanor and to cooperate with both state and federal investigations. Thereafter, the state believed that Lewis breached the agreement by failing to cooperate with an FBI arson investigation.
Lewis had admitted to the theft of a small tractor in Avoyelles Parish. As a result of his confession, defendant was subsequently charged with theft in Avo-yelles Parish. The court found that during the course of the plea negotiations, Lewis believed that he was being offered immunity throughout Louisiana. Analogizing the plea negotiations to a civil contract, the court concluded that the agreement was void because both parties apparently were mistaken as to what was to be exchanged.
The next issue concerned the admissibility of Lewis’s confessions. The Lewis court adopted the “totality of circumstances” test for determining whether defendant’s statements were given “voluntarily.” The court said that when determining whether a defendant’s statements are given voluntarily, the “totality of circumstances” inquiry requires the reviewing court to investigate and analyze “both the characteristics of the accused and the details of the interrogations.” Lewis, 539 So.2d at 1205, citing United States v. Grant, 622 F.2d 308, 316 (8th Cir.1980). Under this test, the ultimate question to be answered is whether the statements were the product of an essentially free and unconstrained choice or the result of an overborne will. Lems, at 1205.
Utilizing this test, the court in Lewis, supra, focused on the plea agreement signed by defendant. This agreement required defendant to confess to “any and all related criminal offenses taking place within the jurisdiction of the United States of America and/or under the jurisdiction of the State of Louisiana.” In exchange, the Rapides Parish District Attorney promised, “anything whatsoever, that Jimmy Lewis communicates and/or conveys to law enforcement officers, in connection with this plea agreement, will not be used against him, nor any derivative evidence obtained as a result of his cooperation will be used against him.” Lewis, 539 So.2d at 1205. The court concluded that this promise assured Lewis that any evidence he gave would not be used against him. Because the statements were given as a result of this promise, they were not voluntary. Lewis, 539 So.2d at 1205-06.
The instant case is significantly distinguishable from Nall and Lewis. In the present case, through their counsel, applicants represented to the district attorney that Ronnie Gross had not been involved in the murder, that Virgil Gross’ participation was after the fact and that both could provide information which would lead to *135 the arrest and conviction of Mario Jones. Based on these representations, the district attorney offered and subsequently entered into a plea agreement with defendants. Pursuant to the plea agreement, the district attorney promised defendants that if they cooperated fully and provided truthful information, Ronnie Gross would receive transactional immunity from prosecution and Virgil Gross would be allowed to plead guilty to Accessory After the Fact to Second Degree Murder.
However, the agreement also provided that if either were untruthful at any time concerning matters directly or indirectly connected to the investigation, there would he no grant of immunity, no plea to accessory after the fact and any statements or information provided could later be used as evidence against them in their prosecution.
The facts show that the prosecution did not breach the agreement and that other evidence, independently developed, proved that the Grosses had participated in the murder and tried to conceal their part by giving authorities misleading statements and information. In determining whether the joint statement was given voluntarily, the “totality of the circumstances” inquiry requires the reviewing court to investigate and analyze both the characteristics of the accused and the details of the interrogation. Both applicants were represented by counsel and fully understood that if they lied their statements would be admissible in a later prosecution. The transcript of the joint statement shows that both defense counsel and district attorney emphasized this point. Under the totality of these circumstances, applicants’ statements were given voluntarily with the understanding that they could be used in a subsequent prosecution. To do otherwise would allow them to profit by their deliberate and intentional misrepresentations. Most alarming, as the instant case vividly illustrates, is the idea that the defendants’ lies could enable them to be virtually insulated from prosecution. See Nall, 379 So.2d 731, 734 Summers, J., dissenting in part.
RONNIE GROSS’ SEPTEMBER 7 STATEMENT
Before taking any statement from Ronnie Gross on September 7, Detective Powdrill went over her efforts to contact him to insure that the record clearly demonstrated that she initiated the interview. She specifically stated that she understood what she was doing and did not want an attorney present. She stated that she had spoken with her attorney that day “but I turn him down” and rejected his advice to say nothing. She acknowledged that the deal for immunity was off and after being meticulously advised of her Miranda rights persisted in her determination to make another statement. See Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); State v. Carr, 530 So.2d 579 (La.App. 1st Cir.1988), writ denied, 533 So.2d 354 (La.1988), cert. denied, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989).
Under these circumstances this statement was clearly voluntary and admissible.
CONCLUSION
The trial judge’s decision to overrule the motions to suppress is affirmed. Defendants’ statements are considered voluntarily given and along with any fruits deriving therefrom are admissible in their prosecution.
AFFIRMED.
NORRIS, J., concurs with written reasons.